The State's evidence is to the effect that on the morning of July 20, 1929, and during the night preceding it, there was an encounter during which many shots were exchanged between United States officers who were engaged in the Border Patrol Service and persons residing in the Republic of Mexico, who were attempting to invade the United States and bring into it contraband property in violation of the law. During the conflict mentioned one of the United States officers named Ivan Scotten was killed. There was evidence introduced by the State to the effect that appellant was one of those acting with the invaders and one of those who personally fired a shot into the body of Scotten after he was wounded. According to the testimony, at the time of his death Scotten was reputed to have possessed certain property consisting of pistols, a flashlight, ring and wrist watch, and that some parts of the property mentioned were found in the possession of the invaders including the appellant.
A witness for the State testified that the appellant was in the habit of wearing a peculiar suit of clothes, and that on the occasion of the encounter mentioned, he had been seen as one of the invaders and recognized by the manner of his clothes. It was the State's theory from this witness and others that appellant went back into Mexico after the encounter ended.
Among the witnesses used by the State were two brothers by the name of Rodriguez, one Matillo (or Mateo) and the other Ignacio. These witnesses were definite in their testimony identifying the appellant as one of the invaders and one who was personally connected with the homicide.
Appellant testified in his own behalf to the effect that *Page 358 
in July, 1929, he was living at San Ysidro, Mexico; that on the 19th of July, he was traveling to Juarez, Mexico. He said he was not carrying beer, whisky or contraband goods, but that after securing in Juarez the supplies for which the journey was made, he left for San Ysidro about five or six o'clock in the afternoon; that due to bad conditions of the road and bad tires, he did not reach San Ysidro until six or seven o'clock the next morning. He then learned from a friend that the fight described by the State's witnesses had taken place during the night. At that time Gregorio Ortega told appellant they had come from a fight which they had had with the Federal officers. Ortega exhibited some arms which he had, namely, a .45 calibre pistol and a .30 calibre carbine rifle. Ortega told appellant that Francisco Velasquez had killed a Federal. Appellant said he knew Mateo Rodriguez and Ignacio Rodriguez, and said that he saw neither of them on the morning of the tragedy. He said he knew Jose Griego but did not see him that morning. Appellant also testified that in 1929 Francisco Velasquez was the chief of the so-called Defense Social or Reserve Guards; that some years later he resigned and appellant succeeded him in that capacity.
In his motion for rehearing appellant complains of the rulings of the court as set out in Bills of Exception Nos. 3 and 2-A. The bills in question show that J. K. White, a witness for the appellant, as well as the appellant, would, if permitted, have testified that in February, 1932, a cow belonging to the said White was stolen; that the animal was later located on the premises of the father of Ignacio and Mateo Rodriguez; that at the time appellant was an officer in the town of San Ysidro and arrested the father and brother of the Rodriguez witnesses and carried them to Juarez, where Jose Rodriguez entered a plea of guilty and was sentenced to six or eight months' confinement in jail and that Ignacio Rodriguez, the father, was discharged. Appellant sought to introduce such proof in an effort to show that the Rodriguez witnesses were actuated by malice in testifying that appellant was the slayer of the deceased. The court qualified the bills of exception to the effect that upon cross-examination both Ignacio and Mateo Rodriguez denied that they had any knowledge of the arrest of their father and brother and of the incarceration of theirbrother in the Juarez jail. The bills are further qualified to the effect that it was not shown in the testimony that said witnesses had knowledge of the facts mentioned.
It is apparent from the qualification that the trial court entertained *Page 359 
the view that it was incumbent upon the appellant to establish by direct proof the fact that the witnesses knew of the incidents mentioned before proof of same would become admissible. In this we think the court was in error. The testimony of both witnesses was to the effect that they frequently visited in Juarez and visited the home of their father. In short, if the court had permitted the appellant and the witness White to give the testimony shown in the bill of exception, the inference could properly have been drawn by the jury from the circumstances in evidence that said witnesses were aware of the activities of the appellant in connection with the arrest of their father and brother and were actuated by malice in testifying against the appellant.
The homicide occurred about the 20th of July, 1929. Appellant was indicted at the January term, 1934. As already shown, Ignacio and Mateo Rodriguez were among the principal witnesses against the appellant. Ignacio Rodriguez testified that he got to the river as the battle with the officers was ending. He observed appellant standing at the car which the officers had abandoned and saw him shoot a rifle. Shortly thereafter appellant came to the river and crossed into Mexico. He had a pistol in his holster around his waist, and a .30-30 rifle and a .45 calibre automatic pistol in his hand. After getting across the river appellant stopped and talked to some men there, saying to them: "Well, boys, I killed him." Mateo Rodriguez gave substantially the same testimony as did Ignacio Rodriguez.
From the testimony of Mateo Rodriguez on cross-examination we quote as follows: "After this trouble was over I told my daddy about seeing Raul shooting at the car. Later I heard some people say that Ivan Scotten had been killed, but I didn't know what the officer's name was at that time. All I can tell you is what I see there. I see Galvan standing there shooting towards the car with a rifle. Yes, I stated in my preliminary hearing testimony that I heard Galvan say that he did the most good because he killed the officer. I didn't have any reason to report that to any officer here in El Paso. Yes, I was not an American citizen and living in El Paso. No, I am not an American citizen. I do believe in the enforcement of the law. No, I didn't report that incident to any one down there nor when I came back to El Paso. The reason I reported it at this time was that Mr. Griffin came down there and asked me did I know anything about it and I told him what I knew; Mr. Fred Griffin from Fabens. I told him about it what I am telling *Page 360 
you. It might have been a little better than a year ago when I was telling him about it; might have been a year. * * * I don't remember when it was that I reported that to Mr. Griffin. I don't remember exactly. I believe it was in September, 1933, or somewhere around there; of course, I was getting my passport fixed and I remember that I was coming from the Immigration Office towards my house when I met him, as far as I can remember. If back in February, 1931, Mr. White who resides across from San Ysidro lost some cows and a few days after these cows were lost Raul was on the Home Guard or Chief of the Municipal Guards down there at San Ysidro and instrumental in finding these cows or the hides of these cows, buried in the front of my father's house, then what have I to do with that? I don't know anything about it; I have never heard my father discuss it. I didn't know that Raul was Chief of the Municipal Guards at that time down there. I don't know whether he was an officer or what he was. I don't know if my father was arrested at that time and taken to jail in Juarez; you know better than I do, I don't know. I can't tell anything about that trouble. I don't know what kind of trouble they been in. I don't know if my father served six months in jail. If you know; I don't know anything about it. I can't tell you if I visited down there during the year 1931, I visited down there very often. * * * I haven't missed my father down there. Every time I feel like going down there and visiting him I find him there. My brothers, Jose and Carlos, or any of the rest of them were never arrested down there; not that I know of by this man here, the defendant, or his Lieutenant Corona, * * * No sir, I don't know that this defendant Raul arrested my father and took him to Juarez and that he spent six months in jail; I don't know what kind of trouble they have been in over there or whether they had any trouble or not. I can't tell you anything about it. I don't know if that offense was taking the cattle from this side."
From the cross-examination of Ignacio Rodriguez we take the following testimony: "I told nobody that I can remember of about this incident at San Ysidro after I came back to El Paso. I was living in El Paso at that time; I am not an American citizen. Yes, I believe in the enforcement of the law. No, I didn't report the fact that I had seen Raul shooting towards the car at that time; I never said anything until Mr. Griffin went out and called me; he went over there to make an investigation; he went over there to see what I knew about it and I just told him what I knew about it. I don't think I would *Page 361 
have said anything about seeing Raul shooting at the car if Mr. Griffin hadn't said anything to me about it. * * * I don't know if some time back there in 1931, some time after February, that there was a little trouble between my father and Jose and Raul. I never heard anything about Raul say anything about them finding some hides out there in front of the house of Mr. Rodriguez. I never heard them say anything about Mr. Rodriguez or any of the boys being in the Juarez jail."
On re-cross examination Ignacio Rodriguez testified in part as follows: "I don't know if my father and brother were placed in the Juarez jail; No, sir, I don't know if the Federal Officers came down to San Ysidro during February, 1931, to investigate about the hides of some cattle that had been stolen from Mr. White and that Galvan assisted the officers and that my brother plead guilty to stealing the cattle and got six months in the Juarez jail."
Mateo Rodriguez, on re-cross examination, testified as follows: "No, I don't know that my brother Jose was arrested back in 1931 by the Juarez officers and that he was charged at that time with theft of cattle from Mr. White across the river and that the hides were found around my father's house at that time and that Raul Galvan assisted the Federal Officers in making the arrest. I don't know a thing in the world about that."
It has been observed that the testimony of the Rodriguez witnesses, if true, discloses that they knew for years that the appellant was guilty of murder; that they made no disclosure of it until after the appellant had displayed some activity in bringing about the arrest, prosecution and conviction of some of the relatives of the Rodriguez witnesses. In their testimony on the trial the Rodriguez witnesses disclaimed any knowledge of such activities on the part of the appellant. They disclaimed knowledge that their near relatives had been convicted and incarcerated. They left with the jury the impression that their activities against the appellant were inspired by no reason save a patriotic desire to aid in bringing a criminal to justice. Appellant would have testified on the trial in the presence of the jury that he had been an actor in the prosecution and conviction of some of the relatives of the prosecuting witnesses. The court denied him that right to make that disclosure before the jury.
It is thought by the writer that the refusal to permit the appellant to make the statement proffered by him in the presence of the jury was not justified but impinged upon his right *Page 362 
to have the jury, in the light of all the testimony, to determine his guilt or innocence, and especially determine whether the activities of the prosecuting witnesses mentioned were inspired by malice or bias against the appellant; that under the circumstances, the right of the appellant to have the jury to determine whether the evidence against him by the witnesses in question in this discussion was true or false is clear. The precedents on the subject of animus, that is to say, of the right to bring before the jury by competent evidence proof of the hostile attitude of a witness in respect to any party or any cause before the court are numerous. Its relevancy as affecting the credibility of the witnesses and the weight of their testimony is a recognized principle of law.
In the case of Burnett v. State, 53 Tex.Crim. Rep., this court, speaking through Judge Ramsey, said: "There can be, we think, no doubt that it is always permissible in every case where it can be shown by competent evidence to make proof of the hostile attitude of any witness in respect to any party or any cause before the court, such evidence is clearly admissible for the purpose of affecting the credibility of witnesses and the weight of their testimony. 2 Ency. of Ev., p. 406; Surrell v. State, 29 Texas Crim. App., 321, and Watts v. State, 18 Texas App., 381."
The hostility or friendship of a witness towards parties is always a factor to be considered in appraising his testimony. See Wharton's Cr. Ev., 11th Ed., Vol. 3, sec. 1417. In sec. 1418, of the same text, it is said: "The motives of the witness may affect his credibility. The degree of credibility to which a witness is entitled depends as much upon the influence and inducements he may have to swerve him from the truth as upon his moral character. Thus, the motive of a person inspiring a criminal prosecution tends to discredit him as a witness." To debate the subject of the admissibility of facts which affect a witness or influence him in shaping his testimony or conduct would be useless as it would tend to demonstrate that which is obvious. Upon this all text-writers agree. See Underhill on Cr. Ev., 3rd Ed., p. 565, sec. 390; Wharton's Cr. Ev., 10th Ed., Vol. 2, p. 767; Corpus Juris., Vol. 70, p. 937.
The writer is impressed with the view that the conviction of the appellant should be reversed and returned to the trial court for a new trial. My associates having reached a different conclusion, I respectfully enter my dissent. *Page 363 
 APPLICATION FOR LEAVE TO FILE SECOND MOTION FOR REHEARING.